UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Clinton King,  )
    Plaintiff,  )
v.  ) No. 15 CV 50047
  ) Magistrate Judge Iain D. Johnston
Carolyn W. Colvin, Acting  )
Commissioner of Social Security,  )
    Defendant.  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Clinton King brings this action under 42 U.S.C. §405(g), challenging the denial of social security disability benefits.

### BACKGROUND

On January 6, 2012, plaintiff Clinton King filed an application for supplemental security income, alleging psychological and physical impairments. As he states in his opening brief, "he was, and continues to remain, homeless" and has "a long history of mental illness" and "a history of incarceration." Dkt. #11 at 1-2. He also has diabetes and back problems.

In December 2011, he was treated at Crusader Clinic for back pain, depression, bipolar disorder, and schizophrenia.[1] *Id.* at 2. He acknowledged that he had been drinking for the last year and was no longer taking his medications. *Id.* He was given psychiatric medications and pain medications for his back, although he was not prescribed any narcotics because his homeless program would not allow them. *Id.*

Also in December 2011, plaintiff had MRIs taken of his lumbar and thoracic spine. *Id.* The report from the lumbar MRI concluded: "Spondylosis. No acute abnormality." R. 434. The

---

[1] This factual summary is taken from plaintiff's opening brief with a few details added by the Court.

1

report from the thoracic MRI concluded: "Minimal lower thoracic spondylosis. Incidental cervical spondylosis." R. 437.

Sometime around January 2012, plaintiff learned that he had diabetes type II and was prescribed insulin. Dkt. #11 at 2. Over the next year, he often sought treatment from both Crusader and the emergency room for vacillating blood sugar counts. *Id.* at 2-3. During this time, he was taking Abilify and Seroquel for his various psychiatric conditions. A few months after taking the medications, he was hospitalized for overdosing on Seroquel while at the same time using cocaine. *Id.* at 3. He joined a drug treatment program thereafter. *Id.* In April 2012, he started some form of counseling at Rosecrance. *Id.* According to treatment notes, he was initially diagnosed with bipolar disorder, PTSD, and alcohol dependence. *Id.*

In June 2012, plaintiff went to Crusader complaining of low back pain extending down into his left leg. Another MRI of his lumbar spine was performed. The conclusion: "Mild lumbar spondylosis without acute osseous abnormality." R. 568. On June 22, 2012, Dr. Kinoshita at Crusader prescribed Sulindac for plaintiff's back pain. Dkt. #11 at 3. Plaintiff continued to go to the emergency room and his primary doctor to treat for high blood sugar and back pain. At a visit to Dr. Kinoshita on December 4, 2012, plaintiff stated that he had been kicked out of the Salvation Army, where he had been residing in an alcohol treatment program, for "possessing contraband medication." *Id.* at 4-5.[2]

In January 2013, plaintiff told counselors at Rosecrance that he had recently been hospitalized because he went into a diabetic coma and passed out on the street. *Id.* at 5. Later in the month, he returned to an alcohol treatment program. *Id.*

As it turns out, the facts summarized above are mostly just for background and do not play any important role in the arguments in this appeal which focuses instead primarily on one

---

[2] The medication was Viagra. R. 511.

document. It is a Functional Capacity Evaluation dated January 22, 2012. Ex. 14F. According to this report, plaintiff was evaluated over two days, January 21st and 22nd, regarding his abilities in 13 categories, such as lifting, standing, sitting, and reaching, and how he could perform them during an eight hour work shift. It is not entirely clear who conducted the evaluation and prepared the report. The name "OSF Saint Anthony Medical Center" is on the top left corner, but the document appears to be on a form from a company called DSI Work Solutions. It contains an "evaluator signature" at the end, but the Court cannot read the name, and the parties have not indicated who this person was, nor what qualifications this person had.

In addition to the Functional Capacity Evaluation, plaintiff also relies to a lesser degree on two subsequent notes from Dr. Kinoshita's office. Ex. 13F. Both are short handwritten notes on a Crusader form titled "Medical/Dental Release" and were written several weeks after the Functional Capacity Evaluation was prepared. Both seem to be—though this point is somewhat in dispute—attempts to summarize that report. Neither party has stated clearly whether Dr. Kinoshita wrote or signed the two notes. To this Court, the signatures do not look like Dr. Kinoshita's name. Even if Dr. Kinoshita did not write the two notes, they at least correspond to office visits he had with plaintiff. The first note is dated February 15, 2013, and states:

> Per functional capacity eval report – he need[s] to stand up a few times an hour, can sit/stand/walk 50% of the time. No bending/reach/lower or elevated activity.

R. 657. In his contemporaneous progress note, Dr. Kinoshita wrote: "45y/o aam presents to office for back pain f/u – in a program, needing note for them saying what he can do, and not." R. 493. The second note is dated February 26, 2013, and states:

> May sit/stand/walk for 50% of the time, need to stand up a few times an hour. Only occasional bend-reaching.

3

R. 658. In his contemporaneous progress note, Dr. Kinoshita wrote: "Needing note for work." R. 491.

On July 29, 2013, a hearing was held before an administrative law judge. Plaintiff was represented by counsel. Plaintiff testified first, and he was followed by a psychological expert whose testimony is not at issue now. Last to testify was Terri Seaver, a vocational expert ("VE"). She testified that plaintiff could perform three types of jobs: hand packer, assembler, and sorter. Thereafter, plaintiff's counsel spent much time asking the VE whether her assessment was consistent with the Functional Capacity Evaluation.

On August 29, 2013, the ALJ issued her opinion finding plaintiff not disabled. Relevant to the present arguments, she found that plaintiff had the severe impairment of degenerative disc disease of the lumbar spine but that it did not meet Listing 1.04A because the x-ray and MRI from June 2012 "did not show any nerve root compromise or central stensosis." R. 13. The ALJ next found that plaintiff had the residual functional capacity ("RFC") to, among other things, "stand/walk and sit at least 4 hours each in an 8-hour workday, but must alternate sitting and standing at least every half hour while continuing to work." R. 14. In addition, the ALJ concluded that plaintiff could lift 10 pounds frequently and 20 pounds occasionally.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by

reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build this logical bridge on behalf of the ALJ or Commissioner. *See Mason v. Colvin*, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014).

Turning to plaintiff's arguments, despite the emphasis in the fact section of his opening brief on the more dramatic aspects of his life (*i.e.* his psychological impairments like schizoaffective disorder, his homelessness and problems in getting kicked out of facilities, his 10-year prison stay, his off-again-on-again battle with alcohol and drugs), plaintiff does not raise any argument based on these issues. Therefore, as the Government correctly points out, any such arguments have been waived in this appeal. Plaintiff instead has chosen to limit his arguments to his physical impairments, chiefly back pain, and how they would supposedly prevent him from doing certain activities on the job. As noted above, this argument relies heavily on the Functional Capacity Evaluation, which will be referred to as the FCE from here on out.

Plaintiff claims that the ALJ committed two key errors in interpreting the FCE. The first is that the ALJ supposedly ignored the finding that plaintiff would need "to stand up a few times an hour" while working. R. 661; Dkt. #11 at 6. The Court is not persuaded by this argument

because the ALJ explicitly included this limitation into the RFC formulation. This formulation states that plaintiff must be allowed to "alternate sitting and standing *at least every half hour*." R. 14 (emphasis added). The Court is not sure why this formulation is deficient. Indisputably, the ALJ did not "ignore" the issue as plaintiff asserts. Plaintiff only offers few cryptic clues as to what is lacking. He points to his testimony that in his last job he had to sit and stand "at certain times" and then faults the ALJ for not asking more about this vague testimony. Dkt. #18 at 2 ("the ALJ did not solicit information regarding the frequency of alternation"). But he does not state now how frequent he would need to alternate sitting and standing. He also asserts that the ALJ wrongly concluded that plaintiff could "persist for 30 minutes at a time before needing to stand up." Dkt. #11 at 7. The Court is again not sure exactly what plaintiff is implying by this criticism. Perhaps plaintiff believes the ALJ's RFC formulation rigidly requires that he alternate only on precise half-hour increments, like the ringing of a town clock. But the actual language used by the ALJ—"alternate sitting and standing at least every half hour"—does not clearly impose such a metronomic requirement. A reasonable and commonsensical reading is that the ALJ was instead merely trying to incorporate the FCE limitation by allowing plaintiff to basically alternate *on average* several times an hour as needed throughout the work day. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) ("Rather than nitpick the ALJ's opinion for inconsistencies or contradictions, we give it a commonsensical reading."). In sum, the Court is not persuaded that the first alleged error requires a remand.

As for the second key error, plaintiff argues that the ALJ ignored the FCE finding that he could not lift *any* weight on a *constant* basis. On this issue, the Court finds that plaintiff has met his burden of showing that a remand is required.

6

The argument rests on the first line of the FCE grid, the category of "Lift-Carry." The evaluator concluded that, in an 8-hour work shift, plaintiff could lift 25 pounds "occasionally" (defined as 1 to 33% of the day), 15 pounds "frequently" (34 to 66% of the day), and no pounds "constantly" (67 to 100%).[3] More specifically, the argument focuses on the latter finding about not being able to lift any weight constantly. A zero was placed in this column. At the hearing, the VE testified that she thought that plaintiff could perform three jobs (hand packer, assembler, sorter), all of which required frequent lifting and all involved sitting at a table doing things such as assembling components or putting small objects in a box. Plaintiff's counsel inquired at the hearing whether these jobs would *also* require plaintiff to do at least *some* lifting on a *constant* basis—in other words, doing a task the FCE seemed to state that plaintiff could not do. This question was discussed extensively, with the ALJ, the VE, and plaintiff's counsel coming back to it several times. The VE's answers were not always clear, as she indicated at one point that the three jobs would only require frequent lifting and not constant lifting. *See* R. 63 ("Yes, the lifting would not be constantly."). Eventually, however, after persistent questioning by plaintiff's counsel, the VE seemed to agree that these jobs would require constant lifting, but at the same time she emphasized that the amount of weight would be very light, likely a pound or less, consisting of items such as a little plastic piece, a pencil, or a bag of potato chips. *See* R. 60 ("Yes, I mean you're going to constantly be lifting something but it's not necessarily going to be as heavy as one pound. It could be as small as a bag of chips that you're putting in the box."); R. 68 ("I mean they're going to have to be lifting at least something."). At the end of this

---

[3] With regard to the first finding (25 pounds occasionally), the form contains an asterisk stating that plaintiff "self restricted before maximum could be determined." Overall, plaintiff gave full effort on 8 out of the 13 tests on the FCE and self-restricted on five parts. This point does not directly affect plaintiff's argument discussed above, but it may be an issue the ALJ should consider more closely on remand.

7

questioning, the ALJ stated: "let me decide how I feel about this then," suggesting she had not reached a conclusion and would address it later in the written opinion.

However, despite the implied promise, the ALJ never did so. The ALJ at least acknowledged the factual predicate, stating earlier in the opinion in the summary of the FCE that "plaintiff could not be expected to lift any weight constantly." R. 16. Later in the opinion, the ALJ specifically analyzed the FCE's findings in some detail, noting how they were "consistent with" the ALJ's opinion in three ways but that one finding—that plaintiff could only reach occasionally instead of frequently—was not consistent with the ALJ's conclusion. R. 18. But in all this discussion, there was no mention of the lifting-constantly issue.

The Court finds that the failure to address this argument requires a remand based on the general rule that an ALJ "may not ignore entire lines of contrary evidence." *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir.2004) ("Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected.").

Although it might be argued that this one line from the FCE is just one small piece of evidence being unfairly plucked by plaintiff from a large body of evidence (the FCE was a single page in the 674-page record), several factors cut against this interpretation. First, as noted above, this issue was discussed extensively at the hearing. Plaintiff's counsel made it a focal point of plaintiff's case. The ALJ gave no indication at the time that she thought it was trivial or not relevant. Second, in her opinion, the ALJ gave significant weight to the FCE as a whole, relying on it heavily and giving it more weight than she gave to the opinions of the agency doctors. R. 18 ("I give far greater weight to" the FCE). There was other evidence in the record, such as MRIs, regarding plaintiff's back problems, but the ALJ did not analyze them or put much weight on

8

them. Third, it is true that the FCE is a brief document containing mostly bottom-line conclusions with little in the way of narrative explanation or analysis, but this does not necessarily mean that it is not important or should be viewed as a passing observation. Although the parties have not provided any background information on the nature and reliability of these reports, the Court notes that the report itself states, and plaintiff confirmed in his hearing testimony, that the evaluation occurred over two days. R. 34, 661. This suggests that it was not a brief or casual analysis nor was it akin to a 10-minute office visit. *See generally Estes v. Colvin*, 2016 WL 1446218, *6, n.2 (N.D. Ill. Apr. 11, 2016) (noting that an FCE is a "detailed series of functional tests, typically performed by a physical or occupational therapist over a period of four to six hours, intended to ascertain an individual's ability to perform specific job-related tasks"). On remand, the ALJ should explore these issues further if she chooses to rely so heavily on the FCE.

The Government's only response is basically to argue harmless error. Specifically, the Government argues: "Plaintiff has failed to show that he was unable to lift items weighting less than a pound, a bag of chips, a pencil, or a small plastic piece." Dkt. #17 at 7. Aside from this one sentence, the Government offered no further explanation, nor did it attempt to marshal the other evidence in the record, such as the MRIs and doctor notes, to bolster its interpretation. This argument thus boils down to the Government's bare assertion, unbacked by any articulated evidence, that it would be reasonable to assume that plaintiff could lift items weighing only a pound constantly throughout the day. As a matter of common experience, this might seem like a reasonable assumption, but the fact remains in this case that the FCE evaluator put a zero in the "constantly" column. The evaluator presumably could have put down the number one or

alternately could have added a written comment. In sum, the Court is not in a position to second-guess this conclusion from the FCE without some additional argument or evidence.

Having concluded that a remand is appropriate, the Court need not reach any definitive conclusions about plaintiff's remaining argument that the two handwritten notes were opinions by Dr. Kinoshita in which he "adopted" the conclusions in the FCE. *See* Dkt. #11 at 7. Plaintiff specifically complains that the ALJ's opinion includes "no mention of the note's author." *Id.* The Court notes that the facts underlying this argument are murky. For one thing, the signature on the notes does not look like Dr. Kinoshita's name, although the handwriting is hard to read, raising a question as to whether Dr. Kinoshita was the author of them or had any role in how they were worded. For another thing, the contextual evidence raises doubt as to whether the writer of these notes intended to express a new opinion or whether was instead merely trying in shorthand fashion to convey the gist of the FCE. The notes are short, handwritten, and slightly inconsistent with each other in a way not easily explainable by some consistent underlying rationale.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: August 25, 2016          By: _____
                                    Iain D. Johnston
                                    United States Magistrate Judge